CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED

July 16, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Kendra Campbell
    DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | |
|---|---|
| DANA JOHNSON, | |
| *Plaintiff,* | Case No. 1:24cv29 |
| v. | |
| UNITED STATES OF AMERICA | |
| *Defendant.* | |

**COMPLAINT**

Plaintiff Dana Johnson ("Plaintiff" or "Mr. Johnson"), through undersigned counsel, files this Complaint against Defendant United States of America. Plaintiff seeks damages for injuries he suffered as a result of the wrongful acts of Defendant's employees. Plaintiff hereby alleges, based on his personal knowledge, information, and belief, as follows.

**NATURE OF ACTION**

1.      "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). Moreover, under the Eighth Amendment, incarcerated individuals must have "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2.      Mr. Johnson, a resident at United States Penitentiary at Lee ("USP Lee") at all times relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs in violation of the United States Constitution. Mr. Johnson's tormentors are the

1

correctional officers and other staff at USP Lee who are charged with protecting Mr. Johnson's rights, ensuring his safety, and providing for his basic human needs. The Defendant intentionally betrays, spectacularly, these basic obligations to Mr. Johnson and the other residents at USP Lee. At USP Lee, residents are not only serving time, but they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3.    Mr. Johnson understands that, as a person serving time in a federal penitentiary, his civil rights are subject to constraints that do not exist outside of a penitentiary. But certain fundamental constitutional and other rights remain, even for those who are incarcerated, like Mr. Johnson. And a torture chamber sanctioned by the federal government in which Defendant assaults residents like Mr. Johnson; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which Defendant enlists and threatens residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.    To make matters worse, Defendant has engaged in a coordinated effort to silence complaints by residents, such as Mr. Johnson, by depriving them of their limited redress for these egregiously horrifying conditions. Defendant does so by withholding the forms residents use to lodge grievances for misconduct by prison staff and refusing to submit completed grievance forms in the required timeframes. Defendant goes as far as intimidating and retaliating against residents

like Mr. Johnson, who pursue legitimate administrative grievances against prison staff for abuse, including by isolating residents in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between residents and their counsel, and; opening and reading clearly marked privileged legal mail communications.  Residents who dare to speak out against staff abuse are moved to other facilities.  As a practical matter, the limited rights incarcerated individuals have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse, such as Mr. Johnson, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because Mr. Johnson's claims present claims alleging negligence  and other wrongful acts by employees of the federal government.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because all or a substantial amount of the events, acts, or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

A.      Plaintiff.

7.      Plaintiff Dana Johnson (Mr. Johnson") is a 33-year-old man who, at all times relevant to this Complaint, was a resident at USP Lee.  Prior to his conviction, Mr. Johnson resided in and was a citizen of the State of Florida.  Mr. Johnson arrived at USP Lee on or around the summer of 2020, and he has since been a victim of a brutal assault by USP Lee officers while in

four-point restraints. Mr. Johnson currently resides at Federal Correction Institution (FCI) Butner Medium II.

B.    Defendant.

8.    Defendant United States of America ("United States") created and oversees the BOP, a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities. The United States employs all BOP correctional officers, guards, and staff named in this Complaint. At all times relevant herein, the individuals mentioned below were acting as agents of the United States.

## FACTS

9.    USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

10.    USP Lee is a high-security facility that houses approximately 1,500 adult males.[1] USP Lee has twelve housing units located in three buildings. Each housing unit can house 128 offenders.[2]

11.    USP Lee has one SHU. The purported purpose of the SHU is to 1) house residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[3]

12.    In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison

---

[1] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[2] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.
[3] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

staff. Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU. These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

13. The prison staff strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded. In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs. In still other instances, prison staff will threaten an individual to violently attack his cellmate within their own cell, where cameras are also not located.

14. To further conceal their abuse, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

15. The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations. The medical staff tasked with providing care in the SHU, including mental health professionals, are complicit in the abuse and torture that take place, and the severe injuries that result. USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to residents and/or by falsifying medical reports. Indeed, medical staff, are often present in the cell while residents are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

16. The conditions of confinement in the SHU are inhumane. Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns

5

that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff. When residents are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row. Individuals are given a total of 10–12 squares of toilet paper per day. The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days. Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor. In some cases, food is withheld from residents altogether for days on end. Recreation time is inconsistent and generally nonexistent. Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

17.    Access to the law library in the SHU is nonexistent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

18.    Residents suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff. USP Lee officers will not only refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms to the appropriate personnel in the required timeframes. Indeed, USP Lee officers threaten individuals who attempt to access to administrative grievances with more, and more severe, violence.

19.    Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, Lt. Smith, Lt. Corbin, Correctional Officer ("CO")

6

Will Hamilton, CO Davis[4], and CO Neff confine individuals like Mr. Johnson in the SHU for no legitimate reason. Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

20.    When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

21.    The almost exclusively white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, other forms of abuse, depriving them of medical attention and other basic rights, and housing them in the SHU. Prison staff also regularly, consistently and openly use vulgar racial epithets to refer to Black and Hispanic residents. USP Lee officers take pride in their culture of violence against Black and Hispanic residents by gruesomely pulling out and hanging residents' hair on display on the penitentiary's fences.

22.    Prison staff often force residents to "put in work" by fighting each other, targeting certain residents for violence. USP Lee officers purposefully pair individuals who pose a safety

---

[4] During his assault, Mr. Johnson observed this individual wearing a nametag that read "Davis." However, sometime after the assault concluded, Mr. Johnson observed this same individual wearing another nametag reflecting an entirely different last name. When Mr. Johnson received a copy of the disciplinary infraction he was issued following the assault, the issuing officer's last name on the report matched the last name Mr. Johnson observed the participating officer wearing after the assault. As such, Mr. Johnson has reason to believe that the identity of the individual who both participated in his assault and whose name is reflected on his disciplinary infraction is not CO Davis and is another officer at USP Lee. For purposes of this complaint, this individual will be referred to as CO Davis as the last name of the correct individual is unknown at this time.

7

threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions. USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo." USP Lee officers threaten to physically assault and abuse any cellmates who do not comply. Because if they fight each other, then they can control the nature of the violence, most cellmates agree to fight rather than risk assault by the USP Lee officers.

23. The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Mr. Johnson, has been previously documented at length. In a September 6, 2019 "Follow-Up Inspection Report,"[5] investigators at the District of Columbia Corrections Information Council (the "CIC")[6] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[7]

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[8]

---

[5] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[6] The District of Columbia does not maintain its own prison system. Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the Federal Bureau of Prisons. The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.
[7] *Id.* at 8, I.
[8] *Id.* at 8, II.

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[9]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[10]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[11]

- Prison staff regularly use racial slurs.[12]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[13]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process.  Residents have complained of being told by Warden Streeval that grievances would "never make it out of the SHU."[14] Other prison staff have told residents that their complaints will never go

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.* at 8, IV.
[13] *Id.*
[14] *Id.*

9

anywhere "because the Warden will lie for his staff."[15]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[16]

- Residents are not provided adequate medical care.[17]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[18]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[19]

24.    As described further below, nothing has changed at USP Lee since the CIC report was issued.  The injuries sustained by Mr. Johnson in 2022 and the unconstitutional and tortious practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

**BOP Guidelines on Use of Force**

25.    The injuries sustained by Mr. Johnson arose, in part, from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

26.    The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[20]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage,

---

[15] *Id.*
[16] *Id.*
[17] *Id.* at 11, V.
[18] *Id.* at 12, VI.
[19] *Id.* at 9, III.
[20] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.

and to ensure institutional security and good order.[21]

27.     Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[22]

28.     Under no circumstances may physical restraints be employed to punish residents.[23]

29.     BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[24]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[25]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[26]  The Warden is the only official at the prison who can decide whether and when "four-point restraints" should be used, and this duty cannot be delegated below the Warden's level.[27]

30.     When a resident is restrained for longer than eight hours, BOP regulations require that the Warden, the Warden's designee, or the institutional administrative duty officer must notify the BOP's Regional Director or Regional Duty Officer.[28]

---

[21] *Id.* ¶ 6(c).
[22] *Id.* ¶ 1.
[23] *Id.* ¶ 6(h)(1).
[24] *Id.* ¶ 6(d).
[25] *Id.* ¶ 9.
[26] *Id.* ¶ 10.
[27] *Id.*
[28] *Id.* ¶ 10(g).

31.    When a resident is chained using the "four-point restraint" method, a review of that resident's chaining in four-point restraints must be made by a lieutenant every two hours to determine if the restraints have had a calming effect so that the resident may be released from the restraints.[29]

32.    As soon as an officer determines the resident has regained physical control and is no longer a threat to himself, other residents, or property, his restraints must be removed.[30]  Staff members violate BOP policy if they keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[31]

33.    Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[32]  In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[33]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

34.    As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Mr. Johnson.

**Defendant's Assault and Torture of Mr. Johnson**

35.    Mr. Johnson arrived at USP Lee in or around the summer of 2020.

---

[29] *Id.* ¶ 10(e).
[30] *Id.* ¶ 5.
[31] *Id.* ¶ 6(b).
[32] *Id.* ¶ 6(j).
[33] *Id.* ¶ 14(a)(1)–(5).

36.      On or around July 4, 2022, Mr. Johnson was in his cell on E-Unit around morning count time when he was told by Officer Clark that he would be moving to another cell because his current cell needed to be used for disciplinary purposes.  Once Mr. Johnson started to pack his things, he realized that the cell he would be moving to would be occupied by a resident from D.C. This was of particular concern to Mr. Johnson because at his prior facility, FCI Jessup, Mr. Johnson was involved in an altercation with an individual from D.C. where he had been stabbed, and he felt that his life would be in danger if he was moved to another cell with a cellmate from D.C. Moreover, his would-be cellmate heard officers talking with Mr. Johnson about moving from down the range, and had yelled over, "he can't come in here."

37.      Due to his concerns, prior to being moved, Mr. Johnson pressed the emergency button in his cell to raise his concerns with staff.  CO Clark and CO Chadwell responded, and Mr. Johnson explained his concerns.  COs Clark and Chadwell called in Lt. Corbin and Lt. Smith to assist, and Mr. Johnson again explained his concerns.

38.      In response, Lt. Smith told Mr. Johnson to "pack [his] shit before [he came in] and pack[ed] it for [him]."  When Mr. Johnson explained his concerns for a third time, Lt. Corbin threatened Mr. Johnson, "Dude, I'm going to beat the fuck out of you."  Mr. Johnson was then instructed by Lt. Corbin to cuff up through the slot in the cell door.  Mr. Johnson complied, and after he was handcuffed, he was placed in black box ambulatory restraints.

39.      At this time, an additional group of officers came to the cell.  Mr. Johnson was forcibly removed from his cell.  Mr. Johnson's head was then pushed down parallel to his knees. Lt. Corbin, Lt. Smith, CO Will Hamilton, CO "Davis," and CO Neff escorted Mr. Johnson to the SHU backwards in a bent over position, which aggravated a previously broken right femur, that, as a result of a previous injury, contains a steel rod the length of his femur.  Mr. Johnson made his

13

discomfort known, and one of the officers escorting him responded, "It's best that you be quiet."

40.    When they arrived in the SHU, Lt. Corbin, CO Kelley and CO Davis escorted Mr. Johnson inside the medical room.  CO Will Hamilton, Lt. Smith and CO Neff stood just outside the door.  Once inside the room, Lt. Corbin said to Mr. Johnson, "You know how the game goes," and further told Mr. Johnson to always report that he had no injuries when asked by the nurse.  Lt. Corbin further threatened Mr. Johnson, stating that if he did not comply, Mr. Johnson would be subject to additional violence.

41.    CO Kelley was holding a camera and recording when an unnamed nurse walked into the medical room and asked Mr. Johnson if he had any injuries to report.  Despite having been threatened, Mr. Johnson replied, "Yes," and informed the nurse that the way he had been forced to walk to the SHU had aggravated his right leg, where he had a rod, and that he needed pain medication.  Lt. Corbin ordered CO Kelley to stop recording and berated Mr. Johnson, asking him, "Are you dumb? Can you comprehend?  Didn't I just tell you to not say shit besides no?  Now do as I say, or we will beat you."  Mr. Johnson nodded his head in agreement.  CO Kelley turned back on the recording, and when asked again by the nurse whether he had any injuries to report, he replied, No."  The nurse then left.

42.    Lt. Corbin, Lt. Smith, CO Kelley, CO "Davis," CO Neff, and CO Will Hamilton then took Mr. Johnson to a holding cell in the SHU.  Lt. Corbin uncuffed Mr. Johnson and instructed him to take off his clothes.  As Mr. Johnson began to remove his clothes, CO Davis snatched Mr. Johnson's shirt off over his head, causing his shirt to rip.  Lt. Corbin then grabbed Mr. Johnson by the neck, pressed him against the wall, and said, "Nigger, the next time I say do something, you do it!"  While Lt. Corbin had Mr. Johnson against the wall, CO Davis and CO Neff stripped Mr. Johnson from the waist down.  An unknown officer then dressed Mr. Johnson in an

14

orange paper-like shirt and panties.

43.     Mr. Johnson was then placed back in ambulatory restraints with a black box, a belly chain, and ankle chains, and escorted to another holding cell in the SHU.  The ankle cuffs were so tight around Mr. Johnson's ankles that it was difficult for him to walk.

44.     Mr. Johnson was told to go to the back of the holding cell, and Lt. Corbin directed him to "get on [his] knees and face the wall."  He continued, "Now this is where the game starts.  Every two hours we're going to come to check on you.  A total of eight hours.  And if you don't comply with what we tell you to do, we're going to beat your ass."  While on his knees, Mr. Johnson heard Lt. Smith instruct another officer to go get a helmet because Mr. Johnson was "going to need it."  After the officer came back with the helmet, Lt. Smith placed the helmet on Mr. Johnson's head.

45.     Lt. Corbin began to use racial slurs and derogatory remarks against Mr. Johnson: "Do you regret this, nigger?  You wish you would have listened, huh boy?  You hear me nigger?"

46.     Following Lt. Corbin's remarks, Lt. Smith punched Mr. Johnson with a closed fist on both the left and right sides of his ribs.  While hitting him, Lt. Smith taunted Mr. Johnson with racial slurs, such as "nigger" and asked him, "You fucking Black nigger, do you regret it?"

47.     CO Davis told Lt. Smith that he was "punching that nigger like a girl, going too light on him."  CO Davis then took his turn attacking Mr. Johnson, while he was still kneeling, facing the wall with Lt. Corbin holding him still by the back of his neck.  CO Davis landed heavy blows with closed fists to both sides of Mr. Johnson's ribs, causing him to fall over.  CO "Davis," standing over Mr. Johnson, asked, "Do you regret it, nigger?"  CO Davis then picked Mr. Johnson up from the floor and placed him back on his knees, facing the wall.  CO Davis then muttered to another unnamed officer, "Give me that," referring to a riot shield.  The officer handed the riot

15

shield to CO Davis who rammed the riot shield into Mr. Johnson's back, neck, and head, resulting in Mr. Johnson's torso and head hitting the wall. Mr. Johnson became dizzy, and his head began throbbing; his nose and his lip started bleeding. Mr. Johnson fell over onto the floor again. No one bothered to help him up, but instead, someone said, "we'll be back nigger," and left the cell, leaving Mr. Johnson helpless and alone on the floor. Eventually, Mr. Johnson lost consciousness.

48. After some time, Mr. Johnson awoke to the sound of officers beating on the door of the holding cell and yelling, "get up, nigger, face against the wall!" Lightheaded and with his head pounding, Mr. Johnson was unable to move, and continued to lie with his back on the floor, defenseless with his nose still bloody. Suddenly, CO Davis came into the cell and using all his weight, slammed the riot shield into Mr. Johnson's chest and stomach.

49. As CO Davis started to get off of Mr. Johnson, pushing up on Mr. Johnson with his whole weight to do so, CO Will Hamilton, CO Neff, and Lt. Smith began to kick Mr. Johnson's side and legs. As CO Will Hamilton and Lt. Smith stepped back, CO Neff kicked and stomped on Mr. Johnson's stomach. When CO Neff stepped back, either Lt. Corbin or Lt. Smith said, "put that nigger on the bed." As two officers were helping him up, Mr. Johnson, in excruciating pain, yelled out, "Man, this isn't necessary! Can't we just talk about it?" Lt. Corbin responded, "It's too late for that, nigger." Lt. Corbin again instructed other officers to "pick [his] ass up and put him on the bed."

50. Then, Lt. Corbin, Lt. Smith, CO "Davis," CO Will Hamilton, CO Neff, and CO Kelley walked Mr. Johnson backwards, bent over with his head down, again putting stress on his leg (which contained the steel rod), from the holding cell in the SHU, up a flight of stairs, and into a cell containing a cement block with rings on each corner. The cell had no clock, no windows, no padding, and the camera was covered with toilet paper. Once inside the cell, Lt. Corbin ordered

16

the other five officers to put Mr. Johnson into four-point restraints on his back and chain him to the cement block.

51.    Once Lt. Corbin, Lt. Smith, CO "Davis," CO Will Hamilton, CO Neff and CO Kelley had Mr. Johnson restrained by his wrists and ankles and chained to the cement block, the group began to use profanity and racial slurs against Mr. Johnson as each took turns punching him repeatedly in the ribs and abdomen, yelling that he was a "fucking nigger" and commenting amongst themselves about how they were hitting him: "don't hit him like that, hit him like this!"; "I was taught to hit a person like this."

52.    At some point, these officers paused the assault as CO Will Hamilton left the cell. Mr. Johnson then asked if he could have some water. Lt. Smith replied, mockingly, "of course" and directed CO Neff to "go get the nigger some water." When CO Will Hamilton returned, he brought in a piece of cake that appeared to have been stomped on by a muddy boot. He walked over to Mr. Johnson and punched him hard in the stomach. He said, "here's some cake, nigger, eat cake," and then shoved the cake in Mr. Johnson's mouth. Part of the cake fell off his face, and Mr. Johnson could smell and taste that the cake had been sprayed with mace, and did his best to spit it out. CO Will Hamilton yelled at Mr. Johnson, "You better eat this fucking cake, nigger," and attempted to shove the rest of the cake into Mr. Johnson's mouth.

53.    Meanwhile, CO Neff had returned with the water, and had handed it to Lt. Smith. As CO Will Hamilton shoved the cake back into Mr. Johnson's mouth, Lt. Smith exclaimed, "Here's your water, nigger!" and began pouring the water into Mr. Johnson's nose and mouth. Mr. Johnson could not breathe with his mouth full and the water pouring over his nose, so he had to swallow the mace-and-mud-ladened cake.

54.    After Mr. Johnson swallowed the cake, Lt. Smith punched Mr. Johnson in the ribs

17

while stating, "We will be back, nigger." As the officers were leaving the cell, Mr. Johnson heard CO Neff mutter to CO Will Hamilton, "The nigger really ate it."

55. Over the course of the next 24 hours, every two hours, a group of officers, including CO Davis, CO Will Hamilton, CO Neff, CO Lovell, CO Kelley, Lt. Smith, Lt. Hamilton, and another unknown lieutenant, entered the cell to assault and make racially and sexually derogatory remarks to Mr. Johnson. Each time was a little different, but often included closed fist punches to his rib cage and torso and slamming a riot shield on top of Mr. Johnson. These officers also routinely referred to Mr. Johnson as a nigger and made comments about the panties he was wearing. They also twisted Mr. Johnson's ankles and wrists in opposite directions, aggressively and deliberately grating the shackles against Mr. Johnson's ankles and wrists, scraping off his skin and causing further injury.

56. Right before the midnight shift change, Lt. Smith came into the cell and began to hit Mr. Johnson's legs and ankles with a retractable baton that had a plastic cord tied to one end to use like a whip, all the while yelling: "Nigger, when we tell you to do something, you do it. Never disrespect an order."

57. After shift change (around 12 a.m.), then-Lt. Pollard and CO Lovell entered Mr. Johnson's cell, and a third unknown officer stood at the door where Mr. Johnson was being detained. Mr. Johnson immediately pleaded with them for access to the bathroom, water, and urgent medical attention. CO Lovell approached Mr. Johnson with a riot shield and slammed the shield on Mr. Johnson's stomach, chest, and in his face near his jaw multiple times. CO Lovell then handed the shield to the third unknown officer. Lt. Pollard then quietly walked over to Mr. Johnson, bent over, and settled his face about six inches from Mr. Johnson's head, and said, almost in a whisper, "I'm glad that police officer killed George Floyd. If it was me, I would have

just shot that nigger." In response to Lt. Pollard's comment, CO Lovell responded, "Good one. I hate niggers myself". CO Lovell then sprayed Mr. Johnson in the face with mace. All three officers then left the cell.

58. Lt. Pollard, CO Lovell, and the same unknown third officer repeatedly returned to Mr. Johnson's cell during their overnight shift, repeatedly slamming the riot shield against his body, punching him in the side of his torso, and making snide remarks, including, "if I were you, I would listen to my Lieutenant and officers."

59. On or around July 5, 2022, after the morning shift-change (around 8 a.m.), Lt. Chad Hamilton came to Mr. Johnson's cell with Lt. Corbin, CO Will Hamilton, CO "Davis," CO Lt. Smith, CO Kelley, and CO Neff. Upon seeing Mr. Johnson and realizing who he was, Lt. Chad Hamilton remarked , "oh that's my homeboy," saying to the other officer, "what you doing to my homeboy? Why is he in panties? Why are you beating up my homeboy?" Lt. Chad Hamilton then turned back to Mr. Johnson and asked how he was doing. Mr. Johnson responded that he was not doing well and that he needed to get medical attention.

60. Lt. Chad Hamilton then issued Mr. Johnson a challenge: "tell me my favorite football team and I will let you up." Mr. Johnson knew that Lt. Chad Hamilton was from Florida and guessed Miami. Lt. Chad Hamilton responded, "Thatta boy, I love me some fucking Hurricanes. Let him up."

61. The officers released Mr. Johnson from the four-point restraints and placed him back in ambulatory restraints (without the black box this time). As Mr. Johnson was being cuffed in the ambulatory restraints, Lt. Corbin told Mr. Johnson that he would be going back to his unit. Just before he left the cell, Nurse Nancy Smith came in, briefly rubbed her hand over his wrists and ankles, and said "he's good" before leaving.

62.    As Mr. Johnson was being escorted out the cell, CO Davis added, "You got lucky, nigger.  If I was running the show, I would have shoved a broom stick up your ass."  CO Davis then aggressively yanked the paper underwear up Mr. Johnson's rear, causing bruises to Mr. Johnson's anal area.  Lt. Chad Hamilton quickly admonished CO Davis to refrain from doing things like that while they were on camera as they had entered the hallway.

63.    Over the time Mr. Johnson was in four-point restraints (around 24 hours), he never received any food or water, and he never fell asleep.  He was never given an opportunity to use the restroom, and as a result, urinated and defecated on himself.  Mr. Johnson had no meaningful encounter with a medical professional or a restraint-check during the entire time he was in the four-point restraints.

64.    Lt. Chad Hamilton and Lt. Corbin, CO Will Hamilton, CO Kelley, CO Neff, Lt. Smith and CO Davis then took Mr. Johnson to another holding cell in the SHU where he was changed into his compound clothing, placed into regular handcuffs, and escorted to his housing unit, where he noticed it was daylight again.  Mr. Johnson was placed back into his cell from where he was originally removed, except this time, Mr. Johnson was placed there for disciplinary segregation purposes, and the unit was locked down for a week.

65.    Once alone and unshackled, Mr. Johnson immediately used the restroom, only to realize that he was urinating blood.  He continued to urinate blood for approximately 1–2 weeks with it gradually getting lighter over this period.  He also had a brutal headache that persisted on and off for approximately two weeks.  Mr. Johnson had significant rib fractures or contusions, which made breathing painful.  Mr. Johnson has scars on both his wrists and ankles.  While at USP Lee, Mr. Johnson did not request medical attention out of fear for his life and that he would be brutally attacked by staff again.  Following his transfer in December 2023, Mr. Johnson began

submitting five or six [use formal term] requests per month asking for medical attention for lingering pain in his head, neck, back, and feet. He saw a Physician's Assistant on or around March 2024, who said there was nothing they could do about his pain.

66. On the same afternoon that Mr. Johnson was returned to the compound from the SHU, he received a disciplinary infraction for assaulting staff. Mr. Johnson saw the Discipline Hearing Officer (DHO) two days later. After seeing Mr. Johnson (and his visible injuries), the hearing officer asked Mr. Johnson what happened to him. Mr. Johnson replied that he had been "tied up and beaten." After reading Mr. Johnson's infraction again, the DHO Officer stated that there was no way the alleged assault on staff could have occurred because he was "tied up." The DHO Officer then stated that the disciplinary infraction for assault on staff would be dismissed. Mr. Johnson was not charged with an assault on staff.

## CAUSES OF ACTION

### COUNT ONE

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

67. Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraph 1–66 above.

68. The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law enforcement officers of the United States.

69. Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that

21

creates in that other person's mind a reasonable apprehension of an imminent battery. Battery is an unwanted touching which is neither consented to, nor excused, nor justified.

70.     As outlined above, on or around July 3, 2022 through July 4, 2022, Lt. Corbin, Lt. Smith, Lt. Pollard, CO Will Hamilton, CO "Davis," CO Lovell, CO Kelley, and CO Neff, repeatedly touched Mr. Johnson in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing Mr. Johnson significant harm. Beyond mere touching, Lt. Corbin, Lt. Smith, Lt. Pollard, CO Will Hamilton, CO "Davis," CO Lovell, CO Kelley, and CO Neff, on several occasions relevant to this Complaint, without provocation or justification, grabbed Mr. Johnson by the neck and pressed him against the wall; placed him in ambulatory and later, four-point restraints, both of which were unwarranted and too tight; punched him repeatedly with closed fists in the ribs; kicked Mr. Johnson in his side and his legs and stomped his stomach; slammed him into the wall with a riot shield; twisted the shackles on Mr. Johnson's ankles and wrists; shoved mace-laden cake into his mouth, poured water over his nose and mouth; sprayed mace on his face; and hit him with a retractable baton tied with a thin whip-like cord.

71.     At times, the assault and battery against Mr. Johnson occurred while he was naked or wearing little clothing, causing severe and lasting injuries to his body.

72.     These touchings by Lt. Corbin, Lt. Smith, Lt. Pollard, CO Will Hamilton, CO "Davis," CO Lovell, CO Kelley, and CO Neff were unsolicited by Mr. Johnson, unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Furthermore, these officers engaged in acts, including berating and threatening Mr. Johnson, and using derogatory remarks such as "nigger" against him, intending to create a reasonable apprehension of immediate, unwanted touching of Mr. Johnson.

73.     During the tortious conduct committed by Lt. Corbin, Lt. Smith, Lt. Pollard,

22

CO Will Hamilton, CO "Davis," CO Lovell, CO Kelley, and CO Neff against Mr. Johnson, each of these officers were acting within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

74.    The actions by these officers were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, Mr. Johnson has suffered various bruises and contusions, a split lip and a bloody nose, cuts on his wrists, ankles, and belly that left permanent scarring, a bruised anal area, a bruised kidney, and aggravated a previous injury to his right leg, as well as emotional pain and suffering for which the United States of America is liable.

COUNT TWO

*Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 1346(b), 2671–80 (1946))*
*(Against Defendant United States of America)*

75.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–74 above.

76.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

77.    Under Virginia law a negligence claim is established by:  (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

78.    The aforementioned officers, in the exercise of reasonable care, and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, had a duty to keep Mr. Johnson safe, and breached that duty by repeatedly grabbing, striking, kicking, restraining, force-feeding mace, and otherwise torturing Mr. Johnson, and failing to protect Mr. Johnson from that conduct.  These officers knew that their failure to uphold this duty

23

placed Mr. Johnson at an unreasonable risk of physical and mental injury.

79.    Lt. Corbin, Lt. Smith, Lt. Pollard, CO Will Hamilton, CO "Davis," CO Lovell, CO Kelley, CO Neff and an unnamed nurse, in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, breached their duties by using gratuitous force against Mr. Johnson and failing to intervene, regarding the use of restraints and further abuse, and they did so deliberately or carelessly, without proper regard to the risk of harm to Mr. Johnson.

80.    As a direct and proximate result of the negligence and carelessness of these officers, Mr. Johnson has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of these acts or omissions, Mr. Johnson has suffered injuries for which he seeks compensatory and actual damages against the United States.

## COUNT THREE

*Medical Malpractice Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

81.    Plaintiff incorporates by reference as though fully restated herein, the allegations set forth in Paragraphs 1–80 above.

82.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

83.    Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

84.    Nurse Nancy Smith, in her capacity and pursuant to her authority and responsibilities as a nurse and an official, employee and/or agent of the United States of America,

24

owed Plaintiff a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

85.    Nurse Nancy Smith breached her duty of care by failing to ensure that Mr. Johnson received from her reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his medical treatment when she observed him, bloody, weak and battered, immediately after he was released from four-point restraints, and failed to inquire of his health, and performed only a perfunctory assessment of his injuries.

86.    As a proximate and causal result of Nurse Nancy Smith's failure to provide any medical care, Mr. Johnson has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

## RELIEF SOUGHT

A.    Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law.

B.    Plaintiff requests $10,000,000 in compensatory damages from Defendant.

C.    Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and costs arising from this action; and

D.    Plaintiff requests any and all other relief this Court deems just and proper.


Dated: July 16, 2024                          Respectfully submitted,

                                              [Signatures on the following page]


25

*/s/ W. Hunter Winstead*
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston (*pro hac vice*
forthcoming)
William H. Swain (*pro hac vice* forthcoming)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com

*/s/ Kristin L. McGough*
Kristin L. McGough (*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Mr. Dana Johnson*