CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
October 28, 2026
LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA ABINGDON DIVISION**

| | | |
|---|---|---|
| **DANA JOHNSON,** | ) | |
| Plaintiff, | ) | Case No. 1:24CV00029 |
| v. | ) | **OPINION AND ORDER** |
| **UNITED STATES OF AMERICA,** | ) | JUDGE JAMES P. JONES |
| Defendant. | ) | |

*Glenn E. Chappell, GILBERT LLP, Washington, D.C., Kristin L. McGough, WINSTON TAYLOR LLP, Washington, D.C., and Leslie Faith Jones,* WASHINGTON LAWYER'S COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, *Washington, D.C., for Plaintiff; Laura Day Taylor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Defendant.*

In this prisoner-plaintiff tort case, the plaintiff, Dana Johnson, asserts claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, for assault and battery, negligence, and medical malpractice. His allegations stem from an incident in which he was allegedly abused by staff at a federal prison and deprived of medical care for his injuries. The United States has moved to dismiss Count Three of the Complaint, the medical malpractice claim, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). After reviewing the record, I conclude that the plaintiff has properly exhausted his required administrative remedy, so that subject-matter jurisdiction over the claim exists.

However, he has not alleged facts in the Complaint sufficient to make out a plausible claim of medical malpractice. Therefore, the Motion to Dismiss as to Count Three must be granted, with leave to amend.[1]

I. Factual Allegations.

Johnson alleges the following facts in his Complaint, which I must accept as true for purposes of deciding the Motion to Dismiss.

Johnson's allegations stem from a particular incident of abuse that he endured while being incarcerated at United States Penitentiary Lee (USP Lee), a maximum security prison located in this judicial district and operated by the Bureau of Prisons (BOP), an agency of the United States. He paints a harrowing picture of abuse and torture at the hands of USP Lee staff, alleging that "hundreds of residents [] have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs." Compl. ¶ 2, Dkt. No. 1. He calls the facility "a torture chamber sanctioned by the federal government." *Id.* ¶ 3. He alleges that the prison engages in a "coordinated effort to silence complaints by residents," *Id.* ¶ 4, including placing "toilet paper over the cameras in the [Special

[1] The United States has submitted extraneous documents along with its brief in support of its Motion to Dismiss, including the plaintiff's medical records. Except for a copy of the plaintiff's administrative claim, I have not considered these documents in ruling on the Motion to Dismiss and they are excluded. I will not treat the present motion as a motion for summary judgment. *See* Fed. R. Civil P. 12(d) (providing that a motion under Rule 12(b)(6) that presents matters outside the pleadings that are not excluded by the court "must be treated as one for summary judgment under Rule 56"). *Id.*

Housing Unit (SHU)] holding cells, which do not capture sound, to prevent their actions from being recorded," *Id.* ¶ 13, and taking residents "to blind spots in the SHU . . . where cameras cannot record the abuse that occurs." *Id.* Johnson claims that to "further conceal their abuse, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries." *Id.* ¶ 14.

On July 3, 2022, the day of the incident, after allegedly expressing disagreement with staff about being given a new cellmate, the staff placed Johnson in ambulatory restraints and "forcibly removed" him from his cell to transfer him to the SHU. *Id.* ¶ 39. While being escorted to the SHU, staff forced Johnson backwards in a bent-over position where his "head was then pushed down parallel to his knees." *Id.* This aggravated Johnson's preexisting femur injury. Johnson "made his discomfort known," but the officers ignored him and made him stay in the unnatural position until they arrived at the SHU. *Id.*

Once inside the SHU, one officer said, "[y]ou know how the game goes." *Id.* ¶ 40. The officer then "further told Mr. Johnson to always report that he had no injuries when asked by the nurse." *Id.* The officers threatened Johnson with violence if he did not comply. They then turned the camera on and brough the nurse in. Despite the threats he had just received, Johnson told the nurse that his leg was in pain from being forced into the SHU. The officers stopped the camera and

threatened to "beat" Johnson if he told the nurse he had any injuries. *Id.* ¶ 41. The recording was then turned back on, the nurse asked if he was injured again, and Johnson replied, "no" this time. *Id.*

The officers then took Johnson to a holding cell within the SHU. After being told to remove his clothes, one of the officers "grabbed Mr. Johnson by the neck, pressed him against the wall," and threatened him. *Id.* ¶ 42. Johnson was then stripped, dressed in "an orange paper-like shirt and panties," and placed in "ambulatory restraints." *Id.* ¶ ¶ 42, 43. He was then escorted to another holding cell and told to "get on [his] knees and face the wall." *Id.* ¶ 44. Johnson abided by these commands.

Johnson heard one officer instruct another to "go get a helmet" to put on Johnson because he was "going to need it." *Id.* Once they put the helmet on Johnson, staff began berating Johnson with "racial slurs and derogatory remarks," and began punching his ribs and torso. *Id.* ¶ 45. Their "heavy blows" caused Johnson to "fall over." *Id.* ¶ 47. They also "rammed [a] riot shield into Mr. Johnson's back, neck, and head, resulting in Mr. Johnson's torso and head hitting the wall." *Id.* This made Johnson start to feel "dizzy, and his head began throbbing; his nose and lips started bleeding." *Id.* He eventually "fell over onto to the floor" and "lost consciousness." *Id.*

Johnson was later awakened by the "sound of officers beating on the door of the holding cell" and yelling at him to get up. *Id.* ¶ 48. Johnson alleges that his "head [was] pounding" and he "was unable to move." *Id.* An officer came into the cell and "slammed the riot shield into Mr. Johnson's chest and stomach." *Id.*

The officers continued to beat him, this time kicking and stomping on him while using racial slurs. Johnson was then taken out of the SHU holding cell, up a flight of stairs, and to yet another SHU cell, where he was shackled into "four-point restraints" and chained to a "cement block." *Id.* ¶ 50. This cell "had no clock, no windows, no padding, and the camera was covered with toilet paper." *Id.* The abuse continued, and the officers took turns punching Johnson while he was restrained. *Id.* ¶ 51. They continued using racial slurs and yelling a variety of dehumanizing remarks.

At a certain point, the "officers paused the assault" and Johnson "then asked if he could have some water." *Id.* ¶ 52. One officer returned with "a piece of cake that appeared to have been stomped on by a muddy boot." *Id.* The officer approached Johnson, "punched him hard in the stomach," said "here's some cake, [expletive], eat cake," and then "shoved the cake in Mr. Johnson's mouth." *Id.*

But Johnson quickly realized that it wasn't typical prison cake — he could "smell and taste that the cake had been sprayed with mace." *Id.* Johnson resisted ingesting the poisonous substance but was ultimately forced to. When an officer

finally brought in water, it was not for Johnson to drink. The officers poured the water over Johnson's nose while forcing the cake in his mouth, choking him so that "he had to swallow the mace-and-mud-ladened cake" in order to breathe. *Id*. ¶ 53.

Johnson further alleges that "[o]ver the course of the next 24 hours, every two hours, a group of officers . . . entered the cell to assault and make racially and sexually derogatory remarks" to him. *Id*. ¶ 55. They also "twisted [his] ankles and wrists in opposite directions, aggressively and deliberately grating the shackles against [his] ankles and wrists, scraping off his skin and causing further injury." *Id*.

After the midnight shift change, new officers arrived. Johnson "pleaded with them for access to the bathroom, water, and urgent medical attention." *Id*. ¶ 57. The officers continued to abuse him. One officer 'bent over, settled his face about six inches from Mr. Johnson's head, and said, almost in a whisper, "I'm glad that police officer killed George Floyd. If it was me, I would have just shot that [expletive].'" *Id*. Another officer then "sprayed Mr. Johnson in the face with mace." *Id*.

Johnson was eventually released from the "four-point restraints and placed [] back in ambulatory restraints." *Id*. ¶ 61. He alleges that "[j]ust before he left the cell, Nurse Nancy Smith came in, briefly rubbed her hand over his wrists and ankles, and said 'he's good' before leaving." *Id*. During their interaction, he was bruised, bleeding, and suffering from head trauma caused by the beatings he had just endured. Nurse Smith did not offer him any kind of medical treatment. *Id*.

In fact, Johnson alleges that he was not provided with any medical treatment, food, water, access to a toilet, or opportunity to sleep throughout his entire time in four-point restraints. *Id.* ¶ 63. As he was being escorted out of the cell, an officer "aggressively yanked the paper underwear up Mr. Johnson's rear, causing bruises to [his] anal area." *Id.* ¶ 62. Immediately after getting taken back to the cell that he was originally removed from, he "used the restroom, only to realize that he was urinating blood." *Id.* ¶ 65. This continued for approximately one to two weeks. *Id.* Johnson also alleges that he remained in significant pain, including headaches and painful breathing. He alleges that Nurse Smith's "failure to provide any medical care" caused him to endure "physical, mental, and emotional pain and suffering." *Id.* ¶ 86. He alleges that he was afraid to ask for further medical attention at USP Lee "out of fear for his life and that he would be brutally attacked by staff again." *Id.* ¶ 65. Once he was transferred to another facility, he submitted multiple requests per month asking for medical attention to deal with the "lingering pain" of his injuries from the USP Lee staff. *Id.*

Johnson further alleges that BOP policy requires that "ambulatory restraints" and "four-point restraints" should be used if they are the "only means available to obtain and maintain control over a resident." *Id.* ¶ 29. BOP policy also provides that on application of restraints, as occurred here, "Health Services staff should evaluate the inmate twice in every eight-hour shift." Mem. Law Supp. Mot. Dismiss

3, Dkt. No. 22. It follows that if Health Services staff had complied with the policy, then a member of the medical staff would have evaluated him for injuries multiple times over the twenty-four-hour period that he was restrained. Johnson alleges in his Complaint that he had many visible injuries throughout this period, including "various bruises and contusions, a split lip and a bloody nose, cuts on his wrists, ankles, and belly that left permanent scarring, a bruised anal area, [and] a bruised kidney." Compl. ¶ 74, Dkt. No. 1. He also alleges that he had "aggravated a previous injury to his right leg" and that he was dealing with "emotional pain and suffering" from the incident as well. *Id.*

Johnson finally alleges that, after being returned to his original cell, he received a "disciplinary infraction" accusing him of assaulting a staff member. *Id.* ¶ 66. Two days after the incident, Johnson met with a Disciplinary Hearing Officer who noticed his "visible injuries" and asked him what happened. *Id.* Johnson explained that he had been "tied up and beaten." *Id.* Following the meeting, the disciplinary charge against Johnson was dismissed. *Id.*

Johnson filed an administrative tort claim, received by the regional office on December 4, 2023, within the required statutory period. Mem. Law Supp. Mot. Dismiss Ex. 2, Shaw Decl. Attach. A, Standard Form 95 (SF-95), Dkt. No. 22-17. The claim was denied on January 17, 2024. *Id.* at Attach. B, Denial Letter, Dkt. No. 22-18. Johnson then timely filed suit in this court on July 16, 2024. Dkt. No. 1.

The United States now moves to dismiss Count Three, the medical malpractice claim, on two grounds: failure to exhaust resulting in a lack of subject matter jurisdiction under Rule 12(b)(1), and failure to state a claim under Rule 12(b)(6).

II. Rule 12(b)(1).

I will begin with subject-matter jurisdiction. The FTCA provides a limited waiver of the United States' sovereign immunity for certain tort claims. 28 U.S.C. §§ 1346(b)(1), 2674. A plaintiff invoking that waiver must first satisfy the jurisdictional prerequisites Congress prescribed in 28 U.S.C. § 2675. *Van Emburgh ex rel. Estate of Van Emburgh v. United States*, 95 F.4th 795, 800 (4th Cir. 2024). The Fourth Circuit has explained that § 2675's administrative-exhaustion requirement contains "three elements": a claimant must '"present'" the claim to the appropriate federal agency, state the sum sought, and wait either for a final agency denial or for the agency to fail to make a final disposition within six months after the claim is filed.[2] *Id.* at 801.

A claim is presented to the appropriate federal agency when the agency receives "an executed [SF-95] or other written notification of an incident,

[2] It is undisputed in this case that Johnson stated the sum sought in his SF-95, $250,000, and waited until he received the BOP's denial letter before pursuing his claim in federal court. SF-95 at 1, Dkt. No. 22-17. The only element at issue is whether he presented the claim properly.

accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a). The purpose of an SF-95 is to put the agency on notice of the facts surrounding the alleged tort so the agency has sufficient information to investigate the alleged injury and the cause of that injury. *Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994).

If a claim is not raised during the administrative process, suit cannot be brought under the FTCA for that claim and "dismissal is mandatory" for lack of subject matter jurisdiction. *Henderson v. United States*, 785 F.2d 121, 124 (4th Cir. 1986). Any claims outside the scope of Johnson's SF-95 must be dismissed.

Johnson alleges in his SF-95 sufficient factual information to put the government on notice of his medical malpractice claim. In addition to an in-depth discussion of the abuse he suffered, Johnson gives detailed descriptions of his resulting injuries. He also claims that he did not receive any medical care for his injuries. Part of his SF-95 states:

> The above personnell's [sic] breached their 3420.11 Employee Conduct Standards, when they atrociously tortured me while at the same time making hateful racial animus slurs towards me purposely leaving me to suffer the consequences of their racial motivated assaults, left in four point restraints for over 18 hours. *Depriving me of medical attention*, shower, and use of toilet.

SF-95 at 8, Dkt. No. 22-17 (emphasis added).

Johnson also describes in his SF-95 interactions he had with a member of the USP Lee medical staff:

> Once arrived to the S.H.U. . . . I informed the male nurse about my leg problem and how it pained me to the point, I desperately needed some pain reliever medication in hopes to ease the pain . . . . As a professional nurse, the nurse should have intervened to provide me with the medical care, attention warranted.

*Id*. at 4.

The content of Johnson's SF-95 is unlike that of *Sinkfield v. United States*, where I found the plaintiff failed to exhaust a claim for medical malpractice. No. 7:22CV00033, 2023 WL 7002168 (W.D. Va. Oct. 24, 2023), *aff'd,* No. 23-7150, 2025 WL 1431178 (4th Cir. May 19, 2025) (unpublished). Sinkfield's SF-95 did not discuss any kind of medical care related to his injuries. In fact, the *entirety* of Sinkfield's SF-95 stated:

> I was forced by U.S.P. Lee staff to use a plastic chair to climb on my assigned bunk bed that was over 5 feet high. There was no ladder. The plastic chair I was using slipped out from under me and I hit the concrete floor, but my right leg was caught on the way down which then caused my injuries. The living condition was unsafe, since longstanding, unconstitutional. See attachment[.]

2023 WL 7002168, at *2.

Johnson goes much further. In his SF-95, which spans six pages of single-spaced text, he describes the events that led to his injuries, describes interactions with a member of BOP medical personnel, and plainly states that he was deprived of medical attention. This description provided sufficient notice to the BOP to investigate whether Johnson received proper medical care for his injuries.

The government points out a valid flaw in Johnson's SF-95 — although the medical malpractice claim in his Complaint is focused on the negligence by Nurse Nancy Smith in treating him for his injuries, his SF-95 does not specifically discuss Nurse Smith. But an SF-95 does not have to be flawless in order to present sufficient notice. Instead, Johnson's SF-95 only has to allege the underpinnings of the factual scenario "sufficient to enable the agency to investigate the alleged wrongdoing." *Russe ex rel. Estate of Vickers v. United States*, No. 25-1514, 2026 WL 1209058, at *8 (4th Cir. 2026) (unpublished) (quoting *Ahmed*, 30 F.3d at 517); *see also Murrey v. United States*, 73 F.3d 1448, 1452 (7th Cir. 1996) (stating that a plaintiff can allege in his complaint "any cause of action fairly implicit in the facts" stated in his SF-95). It follows that upon reviewing Johnson's SF-95, the BOP would have enough information to identify the nurses, including Nurse Smith, who treated Johnson in response to the incident. Though the FTCA does not "require an agency to undertake an independent search for injuries or theories of liability that are not closely related to the matters described in the [SF-95]," *Smith v. United States*, No. 6:23CV00078, 2024 WL 4218850, at *8 (W.D. Va. Sept. 17, 2024), Johnson's medical malpractice claim is so "closely related," *Id.*, to the matters discussed in his SF-95 that it is "fairly implicit" in the facts alleged. *Murrey*, 73 F.3d at 1452. The BOP was thus provided sufficient notice.

Because Johnson aims to bring a claim for medical malpractice against the United States based on the medical care he received in response to the July 3rd incident, I find that he has fulfilled the exhaustion requirement. As such, since Johnson has exhausted his medical malpractice claim in compliance with 28 U.S.C. § 2675(a), subject-matter jurisdiction is proper under Rule 12(b)(1).

III. Rule 12(b)(6).

Next is the government's argument that, even if the exhaustion requirement is met, Johnson has failed to plausibly state a claim for medical malpractice under Rule 12(b)(6).

Generally, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint need not contain detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"Under the FTCA, the Defendant can be liable for personal injury claims, such as medical malpractice, 'if a private person[] would be liable to the claimant in

accordance with the law of the place where the act or omission occurred.'" *Smith*, 2024 WL 4218850, at *15 (quoting 28 U.S.C. 1346(b)(1)). So Virginia medical malpractice law applies here.

Under Virginia law, to establish a prima facie case of medical malpractice, the plaintiff must allege: (1) the applicable standard of care, (2) that the standard has been violated, and (3) that there is a causal relationship between the violation and the alleged harm. *Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982). The standard of care is defined as "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." Va. Code Ann. § 8.01-581.20(A).

The Virginia Medical Malpractice Act states that a complaint in a medical malpractice action

> shall be deemed a certification that the plaintiff has obtained from an expert witness whom the plaintiff reasonably believes would qualify as an expert witness pursuant to subsection A of § 8.01-581.20 a written opinion signed by the expert witness that states:
>
> BASED UPON A REASONABLE UNDERSTANDING OF THE FACTS, THE DEFENDANT FOR WHOM SERVICE OF PROCESS HAS BEEN REQUESTED DEVIATED FROM THE APPLICABLE STANDARD OF CARE AND THE DEVIATION WAS A PROXIMATE CAUSE OF THE INJURIES CLAIMED.

Va. Code Ann. § 8.01-20.1(A).

This certification is, however, not required "if the plaintiff, in good faith, alleges a medical malpractice action that asserts a theory of liability where expert

testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." *Id*. § 8.01-20.1(B). Although this issue has not been briefed by the parties, it is likely that a medical malpractice claim arising from a failure to offer any treatment to a visibly injured patient would qualify under this limited exception and certification would not be required. *See, e.g.*, *Jefferson Hosp., Inc., v. Van Lear.,* 41 S.E.2d 441, 442 (Va. 1971) (certification is not required when a patient fell and broke his hip while trying to locate the bathroom after a nurse failed to respond to a call light for twenty minutes); *Nichols v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.,* 514 S.E.2d 608, 613 (Va. 1999) (certification is not required when a patient became seriously ill after being given the wrong medication by a pharmacist); *Coston v. Bio-Med. Applications of Va., Inc*., 654 S.E.2d 560, 563 (Va. 2008) (certification is not required when a patient was injured after being placed in a defective chair by an employee who knew the chair was broken).

Even if this exception does not apply in Johnson's case, "there is now a growing consensus that certificate requirements . . . do not govern actions in federal court, because they conflict with and are thus supplanted by the Federal Rules of Civil Procedure." *Pledger v. Lynch*, 5 F.4th 511, 518 (4th Cir. 2021); *see also Gallivan v. United States*, 943 F.3d 291, 294 (6th Cir. 2019); *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019). In *Pledger*, the Fourth Circuit held that "failure

to comply with West Virginia's [medical malpractice certification requirement] is not grounds for dismissal of Pledger's federal-court FTCA action." 5 F.4th at 518. Although the Fourth Circuit has not spoken in a binding fashion that *Pledger* applies to Virginia's medical malpractice certification requirement as well,[3] the defendants have not asserted the contrary and I decline to dismiss the claim on these grounds.

Instead, I will proceed with the government's substantive argument that Johnson fails to state a claim for medical malpractice under Rule 12(b)(6). Although Johnson sufficiently alleges facts to (1) identify the standard of care and (2) allege that the standard has been violated, he fails on (3) causation.

First, Johnson alleges that Nurse Smith, a nurse working at USP Lee, owed him "a duty to render medical care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances." Compl. ¶ 84, Dkt. No. 1. This suffices to allege the existence of a duty of reasonable care under Virginia law. *Williams v. Commonwealth,* 810 S.E.2d 885, 888 (Va. 2017) ("Prisons are required to provide inmates with medical care and treatment."); *Fairfax Hosp. ex rel. Inova*

[3] Although *Pledger* delt with the West Virginia certification requirement, the Fourth Circuit has held in an unpublished opinion that the same concept would apply to Virginia law as well. *Zupko v. United States*, No. 20-2157, 2022 WL 256343, at *1 (4th Cir. 2022) (unpublished) (vacating the district court's dismissal of a medical malpractice claim for failure to comply with Virgina's certification requirements because dismissal was improper under *Pledger*). Additionally, the District of Maryland has applied *Pledger* to Maryland's medical malpractice certification requirement and found that dismissal for failure to certify was unwarranted. *See, e.g.*, *Rodriguez v. United States*, No. 21-CV-0411-LKG, 2022 WL 3156234, at *4 (D. Md. Aug. 8, 2022).

*Health Sys. Hosp., Inc. v. Curtis*, 492 S.E.2d 642, 644 (Va. 1997) ("[A] health care provider owes a duty of reasonable care to the patient.").

Second, Johnson successfully alleges that the standard of care has been violated. He states in his Complaint that Nurse Smith observed Johnson "bloody, weak, battered, immediately after he was released from four-point restraints." Compl. ¶ 85, Dkt. No. 1. To treat Johnson, she "briefly rubbed her hand over his wrists and ankles and said, 'he's good' before leaving." *Id.* ¶ 61. He alleges that Nurse Smith breached her duty of care when she "failed to inquire of his health, and performed only a perfunctory assessment of his injuries" without offering any actual treatment. *Id.* ¶ 85. It would be unreasonable for a practitioner to offer no treatment for a visibly wounded patient, so Johnson's allegations are sufficient to plead a breach of the standard of care.

But Johnson falters at the third prong. He does not allege facts sufficient to form a causal relationship between the violation of the standard of care and the alleged harm. In medical malpractice cases like this one, the plaintiff must "specifically describe[] all the ways in which he alleges the medical staff breached that duty." *Hancock v. United States*, No. 7:22CV00192, 2023 WL 8719627, at *4 (W.D. Va. 2023) (finding causation properly alleged where the plaintiff claimed that "medical staff refused to give him medication for his seizure disorder for six months, which caused him to have several seizures during that time which might have been

avoided."). Johnson details the injuries he suffered, including urinating blood for one to two weeks after the incident, a headache that persisted for two weeks, rib fractures, and contusions, and scars from the lacerations on his wrists and ankles. Compl. ¶ 65, Dkt. No. 1. But, according to his allegations, these injuries were caused by the officers that beat him, not by Nurse Smith.

Instead of actually explaining how Nurse Smith caused him harm, Johnson makes one generic, conclusory statement: "As a proximate and causal result of Nurse Nancy Smith's failure to provide any medical care, Mr. Johnson has endured physical, mental, and emotional pain and suffering for which the United States of America is liable." *Id.* ¶ 86. This conclusory statement is not enough, as it is exactly the kind of "formulaic recitation" that *Twombly* forbids. 550 U.S. at 555.

As such, Johnson has not alleged enough to plausibly state a cause of action for medical malpractice. The government's Motion to Dismiss therefore must be granted.

## VI. Conclusion.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss, Dkt. No. 21, is GRANTED. Count Three is dismissed without prejudice, and Johnson is granted leave to file an amended complaint as to that Count, provided it is filed no more than 21 days from the date of entry of this Opinion and Order.

ENTER: October 28, 2026

/s/ JAMES P. JONES
Senior United States District Judge